Casey, C. J.,
delivered the opinion of the court:
In the summer of 1864, Captain James Wilson, an assistant quartermaster stationed at Indianapolis, in the State of Indiana, acting *92 under orders from bis military superiors, published the following notice:
“MULES WANTED.
“ Quartermasters’ Department, U. S. A.,
“ Indianapolis, Indiana, July 20, 1864.
“ I will purchase in open market all the mules that may he presented and pass inspection at the government stables in this city until further orders. Payment will be made when funds are received, when seven or more are accepted. Price, $152 15 each.
“JAMES WILSON, Capí, and A. Q. M.”
It appears from the proofs in the record that pursuant to this notice or advertisement 23 different parties presented each separate lots of mules. None of these parties had any interest in the mules of any of the others. The whole number purchased from them by Captain Wilson at this time amounted to 2,369. One hundred and ninety were bought from the claimants in this suit. They had presented a larger number, but the others were rejected by the government inspectors. The mules received from these various individuals and firms were branded and turned into the government corral^ 1,334 of the animals sent directly from there into the service, and the remainder of them, amounting to 1,035, were forwarded to Louisville, Kentucky, where they were reinspected and rejected, being under the required age and size. These facts having been reported to the Quartermaster General, he directed that the mules be returned to Indianapolis, and that Captain Wilson require the sellers to take back the defective mules furnished by them respectively, and to deduct from the amounts due for other animals the cost of feeding and transporting the defective mules in the mean time. Captain Wilson notified the various persons from whom the mules had been received. Most, if not all, of them came forward and expressed a willingness to take hack any sold by them with which the United States should be dissatisfied. But the mules received from all the parties had been branded alike and turned in together, and it was found impossible to identify the mules furnished by the respective parties. The mules, either from the fatigues of transportation or from want of care and attention, appeared to be in worse condition' than when received by the United States.
It was then determined that each of the parties sho.uld receive such number of these rejected mules as the whole number bore to those sold by them respectively to the government. To this the claimants assented, and proposed, as well, to pay their share of the feed and *93 transportation of such animals while in possession of the United States.
The price of mules, however, had advanced considerably in the mean time, and the government was in great want of animals; and Captain Wilson, under orders from the Quartermaster General’s department, declined to return the mules to the parties, but forwarded them to Washington city. Here they were reinspected, and out of the 1,035, 654 were found not to conform to the army standard. All of them, however, were put into the service and used by the United States.
The respective parties applied to the Quartermaster General for payment; their application was referred to General James A. Eldn, who reported the facts substantially as detailed here; and that the aggregate expense for transportation, superintendence, &c., for the 1,035 mules was $28,721 92 ; but that the number finally rejected at Washington being only 654, the proportionate part would be$18,148 50, which should be divided among the parties in proportion to the number of mules each one furnished, and that the same be deducted from their respective accounts or vouchers, being at the rate of $7 66 per mule. This report was adopted, and-Captain Wilson was instructed to make the deduction in each case in making payments for the mules. This deduction he made, and these claimants, and twenty others, in distinct suits, seek to recover the-balances so withheld from them respectively.
Where an article is sold subject to the inspection of the purchaser, or of a person designated by him for that purpose, and the goods are received upon such inspection in good faith, there is no warranty of quality, nor can there be any defense to the payment of the price on account of defects in the articles. The purchaser relies upon his own judgment, or on that of the expert whom he employs, and not upon the representations of the seller. But where — as in case of horses or mules purchased for the public service — a well known kind and description of animal is required by the regulations of that service, and there is an evident and manifest departure from that standard in the sale, such as could not have been the result of oversight or inattention, it would be strong evidence of collusion between the inspector and seller. Should, for instance, the regulations, known alike to the inspector and the seller, require that the animals should be at least three years old, and not less than fourteen hands high, and the inspector should receive from the sellers such as were not more than two years old and not over thirteen hands in height, it would be such a palpable and open depart *94 ure as could only occur through the grossest ignorance, or direct fraud of both the seller and inspector. Ignorance of such visible and common qualities is not to he predicated of parties dealing in such animals, and still much less of the inspector, who is selected on account of his supposed or professed knowledge as an expert in such matters.
The natural presumption in such a case is, that the seller and inspector conspired together to circumvent the buyer. That there may have been something of'the kind in these cases I do not regard as altogether improbable. There is, however, no evidence fixing it upon any one or more, or upon all together. If that had been clearly shown, I should regard it as such fraud as would prevent a recovery. But the want of any proof whatever on the subject of the identity of any of the mules proving defective with those sold by any of these parties, precludes us from considering that aspect of the case. And when they were ready and willing to take their proportion of the defective mules, and bear their part of the expense of keeping and transporting them while in the hands of the United States, and the government refused to accede to it, after having itself proposed it, I do not see that they can require anything more. The reasons for rejecting the offer doubtless were the immediate and pressing demand for mules at that juncture, and the large advance in price that had occurred. These considerations clearly made it the interest of the United States to retain the mules, defective as they were, rather than return them to the claimants; for it is pretty certain from the evidence that if they had given them up to the claimants at Indianapolis the enhancement in the price would have more than reimbursed them for the expenses of feeding the mules and for transporting them to Louisville and back to Indianapolis. The offer by the claimants to take back the mules alleged to be defective and pay the incurred expenses, was quite as much as the law required of them. When that was refused there could be no further ground to resist payment in full, according to the stipulated price. In case of a sale where the article is inferior to that which it is stipulated or represented to be, the purchaser must return, or offer to return, the thing sold. And where the seller is willing to take it back and pay -tLe expenses incurred, and the purchaser refuses to deliver it up, there can be no recovery for defect or abatement in the price.
Here the United States regarded it more to their interest'to retain the animals than to be relieved from their price and be reimbursed the expenses incurred in respect of them. They had their election, and they made it. And having deprived the parties of the chance of sav *95 ing themselves harmless by taking back the mules, they must abide by that election, and cannot insist upon another chance in tbe abatement of tbe price.
The evidence shows that in tbe payment to tbe claimants for the 190 nuiles sold, there was deducted at the rate of seven dollars and sixty-six cents per bead from tbe claimant’s voucher, amounting to the sum of $1,455 40.' And for this amount judgment is to be rendered in their favor.
In each of the following cases the court found tbe facts to be substantially as set forth in the preceding case of Allen v. Hammond, and awarded judgment accordingly. The amounts to be recovered
are as follows:
Joseph McVey, 379 mules, $7 .66^ each... $2, 903 46
John A. Bradshaw, 27 mules, $7 66£ each .1_;. 206 85
Lawrence P. Ritchey, 176 mules, $7 66J each. 1,348 31
A. B. G-arshwiler, 30 mules, $7 66£ each. 229 83
Giles W. Goss, 41 mules, $7 66J each. 314 10
George M. Maxfield, 25 mules, $7 66¿ each. 19,1 52
Jesse Pugh, 29 mules, $7 66J each. 222 17
Robert M. Patterson, 27 mules, $7 66J each. 206 85
Milton Pouder, 6 mules, $7 66J each. 45 97
Wm. C. Holmes, 112 mules, $7 66¿ each. 858 01
J. L. & W. N. Evans, 59 mules, $7 66¿- each... 451 99
Geo. Fordice, 312 mules, $7 66J each.:... 2, 390 18
Wm. L. Farrow, 180 mules, $7 66£ each. 1, 378 95
Reuben S. Ragan, 48 mules, $7 66j each. 367 72
James Cook, 98 mules, $7. 66J each... 750 76
John J. Cooper, 330 mules, ‡7 66^ each. 2, 528 08
Harlon Carter, 24 mules, $7 66J each. 183 86
Isaiah Hornaday, 28 mules, $7 66J each. . 214 51
John Sanders, Adm’r, 176 mules, §7 66J each. 1,348 31
Vincent Miller, 14 mules, $7 66J each. 107 25